IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

IN RE:                                  :
                                        :
    REDONDO CONSTRUCTION                :    CASE NO. 02-02887 (GAC)
    CORPORATION, CORP.,                 :
    Debtor                              :    CHAPTER 11
_____:
                                        :
    REDONDO CONSTRUCTION                :
    CORPORATION, CORP.,                 :
    Plaintiff                           :
                                        :
         v.                             :    ADV. NO. 04-00017
                                        :
    SUMMERTIME DEVELOPMENT, CORP.,      :
    Defendant                           :
                                        :
    EUROBANK                            :
    Defendant                           :
    Third Party Plaintiff               :
                                        :
         v.                             :
                                        :
    DORAL BANK                          :
    Third Party Defendant               :
    Third Party Plaintiff               :
                                        :
         v.                             :
                                        :
    LYON BUILDERS CORP.                 :
    Third Party Defendant               :
    Cross-Claimant                      :
                                        :
         v.                             :
                                        :
    REDONDO CONSTRUCTION                :
    CORPORATION, CORP.,                 :
    Cross-Defendant                     :
    ...................................:

**DECISION AND ORDER**

I.   Procedural Background

    Pending before the Court is a Motion for Summary Judgment

filed by Eurobank (docket #161) and an Opposition to the Motion for

Summary Judgment and a Cross-Motion for Partial Summary Judgment filed by Redondo Construction Corporation ("debtor")(docket #169).

The debtor filed a voluntary petition under Chapter 11 on March 19, 2002. On October 8, 2003, the debtor filed a motion requesting an order to show cause against Summertime Development Corp. ("Summertime") and its president, Ramon Martinez Perez ("Martinez"), for violation of the automatic stay (docket #586, legal case). The debtor claimed that Summertime withheld the sum of $390,579.00, that it owed debtor for work performed at the project Summertime Beach Resort ("Casa de Playa"), and that these funds are property of the estate. On December 1, 2003, Summertime requested leave to deposit the disputed amounts in court (docket #669, legal case).

On March 24, 2004, the Court scheduled a hearing and ordered the debtor to file an adversary proceeding to seek turnover of property. The Court ordered Summertime to show cause as to why it failed to deposit the funds (docket #743, legal case). The debtor filed the present adversary proceeding on February 9, 2004, requesting the same relief that it had requested in its motion seeking the order to show cause (docket #1).

On April 27, 2004, the Court held a hearing in which it concluded that the debtor had a strong possibility of prevailing on the merits and that Summertime ignored the orders of the Court to deposit the sum of $390,579.00. It concluded that instead Summertime sold the project receiving $250,000.00 as a down

payment, $500,000.00 at the closing and the note payable of $500,000.00. The Court fined Summertime and Martinez the amount of $10,000.00 and ordered Summertime, Martinez and the Bank & Trust of Puerto Rico ("B&T") to deposit the $500,000.00 note payable with the Court until the matter was decided (docket #819, legal case).

Eurobank, as subsequent holder in interest of the mortgage note, filed a motion for reconsideration of the Court's order to deposit the note (docket #842, legal case), arguing it had the sole right to hold the mortgage note until full payment of the first mortgage and arguing that the Court's order deprived Eurobank of property without due process.

On October 3, 2005, the Court entered a Decision and Order granting Eurobank's motion for reconsideration of the Court's order to deposit the mortgage note, vacating the order requiring Eurobank to deposit the note without prejudice to the debtor seeking this relief in this adversary proceeding (dockets #1185 in legal case and #56 in the present adversary proceeding).

On December 19, 2005, the debtor filed an amended complaint to include Eurobank as a co-defendant, in the present adversary proceeding (docket #85). The complaint was later dismissed against Juan Martinez and Ramon Martinez (docket #114). On August 24, 2006, Eurobank filed a motion to dismiss, and debtor filed a reply (dockets #122 and #123). On May 25, 2007, the Court entered an order denying Eurobank's motion to dismiss, finding that the complaint was sufficiently served (docket #151).

3

On August 10, 2007, Eurobank filed the motion for summary judgment (docket #161) and the debtor filed and opposition and a cross-motion for partial summary judgment (dockets #169 and #170). Then, the debtor filed a motion requesting entry of order denying Eurobank's motion for summary judgment (docket #185) and  Eurobank filed a reply to the debtor's opposition (docket #187). Finally, the debtor filed a sur-reply (docket #196).

On June 26, 2008, Eurobank filed a Third Party complaint against Doral (docket #197). Then, on December 12, 2008, Doral filed a Third Party complaint against Lyon (docket #203) and on the same day, Doral filed the answer to complaint (docket #204). On May 28, 2009, Lyon filed the answer to complaint and a cross-party complaint against the debtor (docket #209). Finally, the debtor filed the answer to the cross-complaint on June 11, 2009 (docket #210).

II. <u>Position of the Parties</u>

A. <u>Debtor</u>

Debtor asserts that B&T, predecessor to Eurobank, provided financing to Summertime for the Project Casa de Playa (docket #169-2, Exhibit B page 1). On February 28 and March 4, 2003, the debtor and Summertime executed amendments to the Contract, including a Subcontract Agreement and an Amended Contract, whereby the parties agreed that the construction of the Project was to be completed by Lyon Builders, Inc. ("Lyon"), Summertime's affiliate. The Amended Contract was relative to the construction of sixty (60) walk up

4

units.  The  debtor  asserts  that  under  the  Amended  Contract,
Summertime  agreed  to  pay  the  debtor  $6,509.65  per  unit  as
retainage,  due  and  payable  at  the  execution  of  the
individualization and purchase deed of each unit or within six (6)
months from the execution of the amendment, whichever came first
(docket #169-2, Exhibit B page 2).

The debtor asserts that on March 2004, Summertime sold the
Project to Playa Bahía, Inc. ("Playa Bahía") and from the sale of
the Project, Summertime was to receive $588,024.03 at the time of
the purchase, and $500,000.00 deferred as a mortgage note issued by
Playa  Bahía,  due  in  120  days  to  a  year,  secured  by  a  second
mortgage  on  the  Project  (docket  #169-2,  Exhibit  B  page  4).  The
debtor also asserts that on several occasions, prior to the closing
on the sale, B&T's officials agreed that from the proceeds of
the sale of the Project to Playa Bahía, the debtor would be paid
the $390,579.00, due thereto (docket #169-2, Exhibit B page 3). The
sale to Playa Bahía was effected and despite demands for payment of
the  $390,579.00,  B&T  refused  to  comply  with  the  agreement.  The
debtor asserts that he fulfilled its obligations under the Amended
Contract and that there is no valid reason for Eurobank to withhold
the $390,579.00 due.

Secondly,  the  debtor  asserts  that  B&T  issued  checks  made
payable jointly to the debtor, Summertime and Lyon for payment to
the debtor for work performed and certified. He also asserts that
B&T authorized payments on the jointly issued checks without the

5

debtor's indorsement. Specifically, checks numbers 36-005797 for $74,916.90, 36-005926 for $151,791.30, 36-006010 for $188,483.00, 36-006090 for $204,377.40, and 36-006223 for $163,977.30, for the total of $783,545.90, were paid to Summertime and Lyon without the debtor's indorsement (docket #169-5, Exhibit E). The debtor argues that some case law has found that, not only does the depositary bank have responsibility, as Eurobank contends, but also the payor bank in favor of the non-indorsing joint payee.

Finally, as to Eurobank assertion that it does not have responsibility as a successor bank, the debtor contends that Eurobank's arguments refer to the asset purchase agreement and are inapposite to a merger transaction, as that of B&T and Eurobank (docket #170-6, Exhibit F).

The debtor contends that Eurobank's acts of withholding the amount due to the debtor under the Amended Contract violates the provisions of 11 U.S.C. § 362(a)(3). Thus, the debtor requests that Eurobank pays $100,000.00 as compensatory damages, plus interest thereon from the filing of this complaint, plus costs and attorneys' fees. Also, that it be imposed punitive damages and sanctions pursuant to 11 U.S.C. § 105(a).

B. <u>Eurobank</u>

Eurobank asserts that it is not liable for B&T's obligations simply because of its succession to such corporation's property. It asserts that an express agreement is necessary to assume the other's company's liabilities, and in this case Eurobank did not

6

expressly assume B&T's liabilities. Eurobank asserts that there was no acknowledgment regarding the existence of said indebtedness and that none of its officials agreed with the debtor that B&T would disburse the sum of $390,579.00 (docket #187, Exhibits A and B, pages 12-15). Secondly, Eurobank asserts that the debtor diligently pursued payment from Summertime and at the same time, Summertime recognized to owe the debtor the amount of $390,579.00, as the only outstanding balance owed, from the work performed at the project Casa de Playa. However, Eurobank contends that when the debtor filed the Second Amended Complaint, it was the first time it claimed a right to receive the total sum of $783,545.90 from the five manager's checks. Eurobank contends that the debtor cannot claim that Summertime owes the sum of $390,579.00, while at the same time also claiming $783,545.90 for work performed in the same project. Thus, Eurobank concludes that the debtor has failed to prove its title to the $783,545.90 and moreover, that the debtor cannot claim the total sum of $783,545.90 because two of the checks have endorsements written "Redondo Construction" and "Redondo Corporation."

Thirdly, Eurobank asserts that none of its officials acknowledged the validity of the debtor's claim regarding the issue of the endorsements (docket #187, Exhibits A and B). On the contrary, Eurobank asserts that they informed Mr. Redondo that his claim was against Doral, as the payor bank (docket #187, Exhibits A and B). Eurobank cites case law in which the courts have found

7

liable the depository bank and not the payor bank. Eurobank asserts that B&T, now Eurobank, as a payor bank followed reasonable commercial standards relying on the clearing process and the warranties given by Doral Bank through its indorsement as a depository bank. Eurobank further contends that Doral's primary obligation and legal duty, as a depository bank, was to verify the validity of the endorsements and that it is primarily liable both to the debtor and Eurobank for its failure to do so. Thus, Eurobank contends that the debtor has failed to include an indispensable party.

Wherefore, Eurobank requests from this Honorable Court to enter summary judgment dismissing the case and denying the debtor's request for partial summary judgment.

C. Doral

In the answer to the complaint, Doral asserts that the checks were credited to Lyon's account in Doral (Docket #204, page 2, line 8). Among Doral's affirmative defenses, included in a generic answer were: that the Third Party Complaint fails to state a cause of action against Doral, that the Court lacks subject matter jurisdiction, that all causes of action are time barred, that the alleged economic loss was caused due to the exclusive negligence or, in the alternative the comparative negligence of Eurobank and/or the debtor, and that the debtor or Eurobank have failed to include indispensable parties.

Doral requests that the Court dismiss the instant complaint

with the imposition against Eurobank of all costs, disbursements, interest, and attorney's fees.

On the other hand, in the third party complaint, Doral asserts that at all relevant times, the five checks were deposited and credited to an account held by Lyon at Doral, at the request of the debtor, Summertime and/or Lyon. Doral asserts that if the debtor is entitled to the compensation alleged, such liability is attributable to Eurobank and/or Lyon. They also assert, that in the event of judgment against Doral, Doral is entitled to judgment against Lyon, for the full amount of the damages awarded to the debtor or Eurobank.

Doral requests that the Court grants the Third Party Complaint plus all costs, expenses, attorney fees and any other remedy that may be fair and equitable.

D. Lyon

In its answer to the complaint, Lyon contends that the Court lacks subject matter jurisdiction, that it fails to state a claim upon which relief can be granted and raises the defense of estoppel. Lyon also asserts that Doral and the debtor were negligent in the filing of the complaint against defendants and Lyon; that it was entitled to collect all checks made payable to the corporation for work performed at the project known as Casa de Playa, as agreed to in the standard form of agreement between contractor and subcontractor; that it obtained the indorsement signature from the debtor on the checks received, and/or was

9

authorized by debtor to endorse the checks on its behalf, prior to the third party indorsement for deposit of the check in its banking account, and in any event, that all causes of action are time barred.

Lyon claims that if Lyon has to reimburse Doral, because Doral had to repay Eurobank, who in turn will have to reimburse the debtor, then Lyon will be entitled to collect from the debtor the total funds disbursed by Doral because it is entitled to collect from the debtor, for the work performed and completed pursuant to the terms and conditions of the executed construction contract at Casa de Playa project.

Lyon requests the Court to deny the third party complaint filed by Doral against Lyon and in the alternative that the third party complaint is awarded, then the cross-claim filed against the debtor be granted plus, all costs, legal expenses and attorney's fees, including but not limited to the dismissal of the complaint originally filed by the debtor against defendants and/or all third party defendants.

III. <u>Factual Background</u>

A. On February 28 and March 4, 2003, the debtor and Summertime executed amendments to the Contract, including a Subcontract Agreement and Amended Contract, whereby the parties agreed that the construction of the Project was to be completed by Lyon (docket #169-4, Exhibit D).

B. The Amended Contract was relative to the construction of sixty (60) walk up units totaling $5,771,149.00. Under the Amended Contract, Summertime agreed to pay the debtor $6,509.65 per unit as retainage, due and payable at the execution of the individualization and purchase deed of each unit or within six (6) months from the execution of the amendment, whichever came first (docket #169-4, Exhibit D).

C. B&T issued checks made payable jointly to the debtor, Summertime and Lyon for payment to the debtor for work performed and certified, from May 2003 to September of 2003. Specifically, checks nos. 36-005797 for $74,916.90, 36-005926 for $151,791.30, 36-006010 for $188,483.00, 36-006090 for $204,377.40, and 36-006223 for $163,977.30, for the total of $783,545.90, were paid to Summertime and Lyon (docket #169-5, Exhibit E).

D.  B&T merged with Eurobank (docket # 170-6, Exhibit F).

IV.  <u>Discussion</u>

There are various matters pending before the Court. The first is whether Eurobank is responsible and liable for B&T's obligations entered into with the debtor prior to the merger. Secondly, whether an agreement was reached between B&T, now Eurobank, and the debtor regarding the payment of the amount of $390,579.00, relating to the Amended Contract, to be paid once the project was sold. Finally, if the checks were properly negotiated by the bank.

A.    <u>Summary Judgment Standard</u>

Under Federal Rule of Civil Procedure 56(c), made applicable in bankruptcy by Federal Rule of Bankruptcy Procedure 7056, summary judgment is available "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corporation v. Catrett, 477 U.S. 317 (1986) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)). As to issues on which the movant, at trial, would be compelled to carry the burden of proof, it must identify those portions of the pleadings which it believes demonstrates that there is no genuine issue of material fact. In re Edgardo Ryan Rijos & Julia E. Cruz Nieves v. Banco Bilbao Vizcaya & Citibank (In re Rijos), 263 B.R. 382, 388 (B.A.P. 1st Cir. 2001). A fact is deemed "material" if it potentially could affect the outcome of the suit. Cortes-Irizarry v. Corporación Insular, 111 F.3d 184, 187 (1st Cir. 1997). Moreover, there will only be a "genuine" or "trial worthy" issue as to such a "material fact," "if a reasonable fact-finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." Id. The Court must view the evidence in a light most favorable to the nonmoving party. In re Rijos, 263 B.R. 382, at 388. Therefore, summary judgment is "inappropriate if inferences are necessary for

12

the judgment and those inferences are not mandated by the record."

Id.

   B. Successor's Liability

   Sections 91 and 91a of Title 7 of the Puerto Rico Laws
Annotated (2006) regulate the merger and consolidation of banks in
Puerto Rico. Section 91(k) provides that:

> The obligations of the merged or consolidated
> corporations and the rights of the creditors
> of any of said corporations, shall in no case
> be injured or impaired in any way by such a
> merger or consolidation, and none of the
> rights, obligations and claims of any person,
> creditor, depositary and trustee shall be
> affected by said merger or consolidation, and
> the consolidated corporation or the newly
> organized corporation, as the case may be,
> shall have all the obligations and be liable
> for all the debts and responsible for
> complying with all the contracts and
> obligations of the merged or consolidated
> corporations, just as they were prior to such
> a merger or consolidation, and their
> stockholders of said corporations so merged
> and consolidated shall continue to be subject
> to the same obligations, claims and suits that
> existed against them when or before the merger
> or the consolidation was made, and all the
> suits, actions and other proceedings then
> pending before any court, to which any of the
> merged or consolidated corporation is a party,
> shall continue to their determination as if no
> such merger or consolidation had taken place,
> Provided, however, That the resulting
> corporation or newly organized entity, as the
> case may be, can be substituted in lieu of the
> corporations which have merged or
> consolidated, by order of the court cognizant
> of the proceedings.

P.R. Laws Ann. tit. 7, § 91(k) (2006).

13

In the present case, Eurobank asserts that they have no responsibility for B&T's liabilities because they did not assume expressly or through a contract or otherwise, B&T's obligations or liabilities associated with Redondo Construction. Section 91(k) of the PR Laws Annotated expressly states that the newly organized corporation shall have all the obligations and is liable for all the debts and responsible for complying with all the contracts and obligations of the merged or consolidated corporations, just as they were prior to such a merger or consolidation. Eurobank at no moment indicates or denies that it merged with B&T, nor it contradicts docket #170-6, Exhibit F, presented by the debtor. Thus, the Court concludes that Eurobank is liable for B&T's obligations and liabilities, contracted with the debtor and entered prior to the merger.

C.   Applicable Law

"Property and contract rights implicated in bankruptcy disputes are determined in accordance with state law." In re Ward, 194 B.R. 703, 711, fn 21  (Bankr. D.Mass. 1996) (citing Butner v. United States, 440 U.S. 48 (1979) and Ralar Distribution, Inc. v. Rubbermaid, Inc. (In re Ralar Distrib., Inc.), 4 F.3d 62, 67-68 (1st Cir. 1993)).  Thus, the Laws of the Commonwealth of Puerto Rico ("Civil Code of 1930") govern the breach of contract and damages claims in the present case.

Contracts in Puerto Rico are governed by the Puerto Rico Civil Code of 1930. The Civil Code in article 1044 states that: "[t]hose

14

obligations arising from contracts have legal force between the contracting parties, and must be fulfilled in accordance with their stipulations." Lopez Torres v. Gonzalez Vazquez, 2004 PRSC 172, 2. See also P.R. Laws Ann. tit. 31, § 2994 (1990).

1. Contracts in General

In Puerto Rico, the law recognizes that the contracting parties may make any agreement and "establish the clauses and conditions, which they may deem advisable, provided that they are not in contravention of the law, morals, or public order." Lopez Torres v. Gonzalez Vazquez, 2004 PRSC 172, 2. See P.R. Laws Ann. tit. 31, § 3372 (1990). Contracts are perfected by the mere consent of the parties, and from that time they are binding, not only with regard to the fulfillment of what has been expressly stipulated, but also with regard to all the consequences which are in accordance with good faith, use and law. Lopez Torres v. Gonzalez Vazquez, 2004 PRSC 172, 2. See also P.R. Laws Ann. tit. 31, § 3375 (1990).

2. Interpretation of Contracts in Puerto Rico

The Puerto Rico Civil Code of 1930, Articles 1233 through 1250, regulates contract interpretation. See P.R. Laws Ann. tit. 31, § 3471 through 3479 (1990). In Municipio de Mayaguez v. Lebron, the Puerto Rico Supreme Court stated that the target in contractual interpretation is to determine what are the real and common intentions of the contracting parties. Municipio de Mayaguez v. Lebron, 2006 PRSC 70, 4.

15

In <u>Marcial v. Tome,</u> 144 P.R. Dec. 522 (1997), the leading case in contracts interpretation, cited throughout the opinion of <u>Municipio de Mayaguez</u>, 2006 PRSC 70, the Puerto Rico Supreme Court held that:

> [a]lthough the starting point of contract interpretation must be the expressions contained in the words, the trier cannot stop at the literal sense, but must fundamentally investigate the intent of the parties and the spirit and purpose of the transaction, as they are inferred from the overall conduct of the interested parties and from the concurring circumstances that may contribute to an adequate investigation of the will of the executing parties. <u>Coop.</u> <u>La Sagrada Familia v. Castillo</u>, 107 D.P.R. 405, 417 [7 P.R. Offic. Trans. 449, 461] (1978). See: <u>Marina Ind., Inc. v. Brown Boveri Corp.</u>, 114 D.P.R. 64, 69-70 [14 P.R. Offic. Trans. 86, 94-95] (1983); <u>Merle v. West Bend Co</u>., 97 D.R.R. 392, 399 (1969).

<u>Marcial v. Tome,</u> 144 P.R. Dec. at 537. "To judge the intention of the contracting parties, all circumstances showing the will of the parties must be examined." <u>Id</u>. at 538. <u>See</u> <u>also</u> P.R. Laws Ann. tit. 31, § 3472 (1990). Specifically, special attention must be paid to "their acts, previous to, contemporaneous with, and subsequent to the execution of the contract." <u>Marcial v. Tome</u>, 144 P.R. Dec. at 538. The Court also held that a Court should consider "the occasion, the circumstances, the persons involved, and the agreement they intended to negotiate." <u>Id</u>.

The Puerto Rico Supreme Court in <u>Marcial v. Tome</u>, reversed the decision of the circuit court because the latter decided to interpret a partnership contract by way of summary judgment. The

16

Supreme Court held that when interpretation of a contract is the matter in question, the best way to know the intent of the parties is to present extrinsic evidence at trial as to the real intention of the parties. The Puerto Rico Supreme Court remanded the case stating:

> [t]hese doubts preclude us from adjudicating this issue without giving the parties an opportunity to present evidence at the pertinent trial. We deem that there is a genuine issue of facts material to the interpretation of the contract clause concerning the intention or purpose for which the special partnership was created.

Id. at 540 (1997).

In the present case, the only uncontested facts and the only factual findings that this Court is in a position to make regarding the amount of $390,579.00 claimed by the debtor against B&T are: that B&T provided financing to Summertime for the Project Casa de Playa, that B&T issued the five checks relating to the project, that on March 2004, Summertime sold the Project to Playa Bahia (docket #56).

The debtor asserts that he reached an agreement with Summertime and with B&T, now Eurobank, relating to the payment of the $390,579.00 owed (docket #169-2, sworn statement, Exhibit B page 3).  On the other hand, Eurobank alleges that it did not reach any kind of agreement and that Summertime is the one who owes the debtor the amount sought (docket #187, sworn statement, Exhibits A and B pages 12-15).

17

The Court finds that in order to determine if an agreement was reached by the parties regarding the payment of the $390,579.00, in view of the fact that both parties have submitted totally contradicting sworn statements, the Court must hold a trial with all the parties involved to clarify regarding the closing and selling of the project and the payment due to the debtor.

D. Negotiable Instruments

The Uniform Commercial Code ("UCC") applies in Puerto Rico in virtue of the Law of Negotiable Instruments and Banking Transactions, Law #208 of August 17, 1998, 19 L.P.R.A. §§ 1-2001. Liability is imposed to the banks if they do not follow the "Ordinary Care" standard. The Ordinary Care standard is defined by the UCC in §3-103(7) as:

> [I]n the case of a person engaged in business means observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged. In the case of a bank that takes an instrument for processing for collection or payment by automated means, reasonable commercial standards do not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage not disapproved by this Article or Article 4.

1. Identification of the person to whom the instrument is payable

Section 3-110 of the UCC, indicates to whom an instrument is payable. This section states:

18

(a) The person to whom an instrument is initially payable is determined by the intent of the person, whether or not authorized, signing as, or in the name or behalf of, the issuer of the instrument. The instrument is payable to the person intended by the signer even if that person is identified in the instrument by a name or other identification that is not that of the intended person. If more than one person signs in the name or behalf of the issuer of an instrument and all the signers do not intend the same person as payee, the instrument is payable to any person intended by one or more of the signers.

....

(c) A person to whom an instrument is payable may be identified in any way, including by name, identifying number, office, or account number.

....

In the present case, the debtor claims that B&T issued five checks made payable jointly to the debtor, Summertime and Lyon for payment to the debtor, for work performed and certified, and that B&T authorized payments on the jointly issued checks without the debtor's indorsement.

The checks were made to the order of "Redondo Construction Corp., Summertime Developer Corp. & Lyon Builder" (docket #169-5, Exhibit E). As section 3-110(a) and 3-110(c) of the UCC states, the person to whom the check is payable is determined by the intent of the issuer of the check, and that person may be identified by its name. No extrinsic evidence has been presented by Eurobank to prove that the intent of B&T, now Eurobank, was to pay Summertime and Lyon, and not Redondo because the five checks clearly identify the three parties by name. When a check is made to the order of

more than one entity or person, section 3-110(d) states to whom the check will be payable to and who may enforce it.

Section 3-110(d) of the UCC deals with checks with multiple endorsements, specifically, section 3-110(d) states:

> (d) If an instrument is payable to two or more persons alternatively, it is payable to any of them and may be negotiated, discharged, or enforced by any or all of them in possession of the instrument. <u>If an instrument is payable to two or more persons not alternatively, it is payable to all of them and may be negotiated, discharged, or enforced only by all of them.</u> If an instrument payable to two or more persons is ambiguous as to whether it is payable to the persons alternatively, the instrument is payable to the persons alternatively.

The Official Comment in the Maryland UCC and in the Texas UCC, both having the same language for section 3-110(d) of the UCC, specifically state the treatment to be given a check with multiple payees:

> "An instrument payable to X or Y is governed by the first sentence of subsection (d). <u>An instrument payable to X and Y is governed by the second sentence of subsection (d)</u>. If an instrument is payable to X or Y, either is the payee and if either is in possession that person is the holder and the person entitled to enforce the instrument.... <u>If an instrument is payable to X and Y, neither X nor Y acting alone is the person to whom the instrument is payable</u>.... <u>The instrument is 'payable to an identified person.'</u> " The "identified person" <u>is X and Y acting jointly</u>.

20

<u>Pelican Nat. bank v. Provident Bank of Maryland</u>, 849 A.2d 475, 481
(Md. 2004). See also, <u>New Wave Technology, Inc. v. Legacy Bank of
Texas</u>, 281 S.W.3d 99, 101 (Tex. 2008).

On the other hand, section 3-301 of the UCC states who is
entitled to enforce an instrument, in this particular case, the five
checks in question. Section 3-301 of the UCC states:

> Person entitled to enforce an instrument.-
> Means: (i) the holder of the instrument, (ii) a
> nonholder in possession of the instrument who has
> the rights of a holder, or (iii) a person not in
> possession of the instrument who is entitled to
> enforce the instrument pursuant to Section 3-309
> or 3-418(d). A person may be a person entitled to
> enforce the instrument even though the person is
> not the owner of the instrument or is in wrongful
> possession of the instrument.

In the present case, B&T issued five checks paid to the order
of "Redondo Construction Corp., Summertime Developer Corp. & Lyon
Builder." The three names were separated by a coma and the connector
word symbol "&", which means "and".

The first check, dated May 16, 2003, and number 36-005797 was
indorsed the following way: line 1: "Summertime Developers, Inc.,"
line 2: "Lyon Builders, Inc.," and line 3: "Account # 05-4000631-9"
(Docket #169-5, Exhibit E page 2, check number 1). The Court can
conclude from a simple examination of the copy of the check that it
lacks the debtor's indorsement.

The second check, dated June 24, 2003, and number 36-005926 was
indorsed the following way: line 1: illegible signature, line 2:

21

"Summertime Developers Corp.," line 3: "Lyon Builders Inc.," line 4: "For deposit only to acc. #," and line 5: "0540006319" (Docket #169-5, Exhibit E pages 1-2, check number 2). The Court cannot conclude with certainty that the check lacked the debtor's indorsement because there is an illegible signature in line 1.

The third check, dated July 24, 2003, and number 36-006010 was indorsed the following way: line 1: "Summertime Developers Corp." line 2: "Lyon Builders, Inc.," and line 3: "Cta. # 05-4000631-9" (Docket #169-5, Exhibit E pages 1-2, check number 3). This check lacked the debtor's indorsement. The Court can conclude from a simple examination of the copy of the check that it lacks the debtor's indorsement.

The fourth check, dated August 26, 2003, and number 36-006090 was indorsed the following way: line 1: "Redondo Construction Corp," Line 2: "Summertime Developers Corp.," line 3: "Lyon Builders Inc.," and a notation in Spanish which means "to deposit into the account of Lyon Builders, Inc. account #05-4000631-9" (Docket #169-5, Exhibit E pages 3-4, check number 1). The Court cannot conclude with certainty that the check lacked the debtor's indorsement because the name of the debtor is in line 1 of the check.

The fifth check, dated September 25, 2003, and number 36-006223 was indorsed the following way: line 1: "Redondo Construction," Line 2: "Summertime Developers" line 3: "Lyon Builders, Inc.," and line 4 "05-40006319" (Docket #169-5, Exhibit E pages 3-4, check

22

number 2). The Court cannot conclude with certainty that the check lacked the debtor's indorsement because the name of the debtor is in line 1 of the check.

As section 3-110(d) states of the UCC, the checks were made payable to more than one payee jointly and not in the alternative thus, the checks could only be negotiated, discharged or enforced by all of the joint payees. Hence, because some of the checks lacked the necessary indorsement of the debtor, they could not be negotiated. Moreover, the three entities were entitled to enforce the checks because they were payable to them and although, the debtor was a nonholder in possession of the instrument, he had the rights of a holder. The Court concludes that the checks were payable to the order of debtor, Summertime and Lyon, and could only be negotiated when the checks were endorsed by the three entities acting jointly.

2. Restrictive Indorsement and Conversion

The second check had the notation "for deposit only to acc. #0540006319," this type of indorsement is called a restrictive indorsement (Docket #169-5, Exhibit E pages 1-2, check number 2). Section 3-206 of the UCC regulates the negotiation or transfer of checks with this kind of indorsement. Specifically, section 3-206(c) of the UCC states:

> (c) If an instrument bears an indorsement (i) described in Section 4-201(b), or (ii) in blank or to a particular bank using the words "for deposit," "for collection," or other

23

words indicating a purpose of having the instrument collected by a bank for the indorser or for a particular account, <u>the following rules apply</u>:

(1) A person, other than a bank, who purchases the instrument when so indorsed converts the instrument unless the amount paid for the instrument is received by the indorser or applied consistently with the indorsement.

(2) <u>A depositary bank that purchases the instrument or takes it for collection when so indorsed converts the instrument unless the amount paid by the bank with respect to the instrument is received by the indorser or applied consistently with the indorsement</u>.

In <u>Commonwealth Federal Sav. & Loans Ass'n v. First Nat. Bank of New Jersey</u>, 513 F.Supp. 296, 305(D.C.Pa. 1979) in <u>citing</u> <u>Titan Air Conditioning Corp. v. Chase Manhattan Bank</u>, 20 U.C.C Rep. Serv. 1234, 1235 (N.Y.Sup.Ct.1977), the court concluded that "(u)ndisputedly, established banking practice mandates that any check payable to a designated business entity can be accepted for deposit only into the account of such named payee." Also, in <u>Commonwealth Federal Sav.</u>, *supra*, the court cited a statement by H. Wallgren, Principles 305 of Bank Operations 92 (rev. ed. 1975):

Many unlawful conversions involve checks payable to legal entities such as corporations, trade-styles, partnerships, decedents' estates, rather than to a natural persons. Checks payable to corporations are normally deposited to an account in the payee corporation's name and should never be accepted for deposit to an account in any other name without prior investigation....

<u>Commonwealth Federal Sav. & Loans Ass'n v. First Nat. Bank of New Jersey</u>, 513 F.Supp. 296, 305( D.C.Pa. 1979).

24

Although all checks were endorsed differently, the same account number appears in all of the five checks. Doral asserts that all the checks were credited to Lyon's account in Doral (Docket #204, page 2, line 8). The Court concludes that the five checks could not be deposited into the account of Lyon because as in the case of Commonwealth Federal Sav., *supra*, any check payable to a designated business entity can be accepted for deposit only into the account of such named payee and it should never be accepted for deposit to an account in any other name without prior investigation. In the present case, although the five checks were paid to the order of the debtor, Summertime and Lyon, the checks were deposited into an account that belong exclusively to Lyon.

On the other hand, section 3-420 of the UCC, deals specifically with the conversion of an instrument:

> (a)  The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment. An action for conversion of an instrument may not be brought by (i) the issuer or acceptor of the instrument or (ii) a payee or indorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a co-payee.
>
> (b)  In an action under subsection (a), the measure of liability is presumed to be the amount payable on the instrument, but recovery may not exceed the amount of the plaintiff's interest in the instrument.

(c) A representative, other than a depositary bank, who has in good faithdealt with an instrument or its proceeds on behalf of one who was not the person entitled to enforce the instrument is not liable in conversion to that person beyond the amount of any proceeds that it has not paid out.

The cases hold that an action for conversion against a bank will lie where a check was negotiated lacking indorsement. Commonwealth Federal Sav. & Loans Ass'n v. First Nat. Bank of New Jersey, 513 F.Supp. 296, 300(D.C.Pa. 1979) In a case similar to the one before us, in Federal Deposit Insurance Company v. Marine National Bank of Jacksonville, the court concluded that the acceptance for deposit to the account of one of two named payees on the check imposed liability upon the bank accepting such deposit. Federal Deposit Insurance Corporation v. Marine National Bank of Jacksonville, 431 F.2d 341 (5th Cir.1970). See also Handel v. Manufacturers Hanover Trust Co., 16 U.C.C.Rep.Serv. 762 (N.Y. SupremeCt.1975) and Williams Mechanical Corp. v. Manufacturers Hanover Trust Co., 20 U.C.C. Rep.Serv. 468 (N.Y. Supreme Ct. 1976).

In the present case, the debtors indorsement was lacking in three of the five checks and all were deposited into an account, which was not in the debtor's name. Section 3-420(a) of the UCC states two requirements to bring forth an action for conversion. The first one is that an action for conversion can not be brought by the issuer, in this case B&T, now Eurobank, and secondly, that it could not be brought by a payee who did not receive delivery of the instrument. In the present case, the action for conversion is

26

brought by the debtor, who is a payee and not the issuer of the check, thus the first requirement is met. On the other hand, the official comment of section 3-420 of the UCC states that "if a check is payable to more than one payee, delivery to one of the payees is deemed to be delivery to all of the payees." Thus, although the debtor never received delivery of the checks, because Summertime and Lyon are co-payees and they did receive the checks, then the debtor has a cause of action for conversion against the bank.

3. <u>Transfer Warranties and Presentment Warranties</u>

Section 4-207 of the UCC, titled Transfer Warranties, allocates the liability of banks, when more than one is involved in a banking transaction where liability maybe imposed. The section states:

> (a) A costumer  or collecting bank that transfers an item and receives a settlement or other consideration warrants to the transferee and to any subsequent collecting bank that:
> > (1) the warrantor is a person entitled to enforce the item;
> >
> > (2) all signatures on the item are authentic and authorized;
> >
> > (3) the item has not been altered;
> >
> > (4) the item is not subject to a defense or claim in recoupment (Section 3-305(a)) of any party that can be asserted against the warrantor; and....
>
> ....
>
> (c) A person to whom the warranties under subsection (a) are made and who took the item in good faith may recover from the warrantor as damages for breach of warranty an amount equal to the loss suffered as a result of the breach, but not more than the amount of the item plus expenses and loss of interest incurred as a result of the breach.

27

....

(e) A cause of action for breach of warranty
under this section accrues when the claimant has
reason to know of the breach.

On the other hand, section 4-208 of the UCC deals with the presentment warranties banks give to each other in case of liability. The section states:

(a) If an unaccepted draft is presented to the drawee for payment or acceptance and the drawee pays or accepts the draft, (i) the person obtaining payment or acceptance, at the time of presentment, and (ii) a previous transferor of the draft, at the time of transfer, warrant to the drawee that pays or accepts the draft in good faith that:

(1) the warrantor is, or was, at the time the warrantor transferred the draft, a person entitled to enforce the draft or authorized to obtain payment or acceptance of the draft on behalf of a person entitled to enforce the draft;

(2) the draft has not been altered; and

(3) the warrantor has no knowledge that the signature of the purported drawer of the draft is unauthorized; and

(4) with respect to any remotely-created consumer item, that the person on whose account the item is drawn authorized the issuance of the item in the amount for which the item is drawn.

(b) A drawee making payment may recover from a warrantor damages for breach of warranty equal to the amount paid by the drawee less the amount the drawee received or is entitled to receive from the drawer because of the payment. In addition, the drawee is entitled to compensation for expenses and loss of interest resulting from the breach. The right of the drawee to recover damages under this subsection is not affected by any failure of the drawee to exercise ordinary care in making payment. If the drawee accepts the draft (i) breach of warranty is a defense to the obligation of the acceptor, and (ii) if the

28

acceptor makes payment with respect to the draft, the acceptor is entitled to recover from a warrantor for breach of warranty the amounts stated in this subsection.

(c) If a drawee asserts a claim for breach of warranty under subsection (a) based on an unauthorized indorsement of the draft or an alteration of the draft, the warrantor may defend by proving that the indorsement is effective under Section 3-404 or 3-405 or the drawer is precluded under Section 3-406 or 4-406 from asserting against the drawee the unauthorized indorsement or alteration.

....

(f) A cause of action for breach of warranty under this section accrues when the claimant has reason to know of the breach.

Numerous states have held that payment of a check without a necessary indorsement of a payee breaches the presentment warranty of good title. See Federal Deposit Insurance Corp. v. Marine National Bank of Jacksonville, 431 F.2d 341 (5th Cir.1970-interpreting Florida Law; Trust Co. of Columbus v. Refrigeration Supplies, Inc., 246 S.E.2d 282, 284-285 n.1 (1978); Morgan Guard. Trust Co. v. Chase Manhattan, 36 UCCRep.584 (N.Y. Sup. Ct 1983); Foremost Insurance Co. v. First City Savings & Loan Association, 374 So.2d 840, 842-8423 (Miss. 1978); Miller, 656 P.2d at 633; Chilson v. Capital Bank of Miami, 701 P.2d 903, 906-907 (1985); Stapleton v. First Security Bank, 675 P.2d 83, 86 (1983). In Longview Bank & Trust Co. v. First Nat. Bank of Azle, the court define what is a warranty of good title. It stated that:

> [a] warranty of good title is nothing more than an assurance that no one has better title to a check than the warrantor, that the

29

> instrument presented contains all necessary
> endorsements and that such endorsements are
> genuine or otherwise deemed effective.

<u>Longview Bank & Trust Co. v. First Nat. Bank of Azle</u>, 750 S.W. 2d 297, 299 (Tex. 1998). <u>See also</u> <u>Aetna Life and Casualty Company v. Hampton State Bank</u>, 497 S.W.2d 80, 84 (Tex. Civ.App.- Dallas 1973, writ ref'd n.r.e.)and <u>Miller v. Federal Deposit Ins. Corp.</u>, 656 P. 2d 631, 633 (Ariz. Ct. App. 1982).

In the present case, there were two banks involved in this transaction, the one that issued the checks, which was B&T, now Eurobank, which is called the payor or drawee bank, and the one that deposited the check which was Doral, called the collecting or depository bank. The debtor filed the present adversary proceeding against the Eurobank, which is the drawee or payor bank, for the checks that were negotiated by Lyon, without the debtor's indorsement. Eurobank contends that Doral is liable because they actually deposited the checks into Lyon's account, with the debtor's missing indorsement.

The question of the establishing the liability between banks was dealt with in <u>Capital Dit. Te. Emp. Federal Credit Union v. Berthaiaume</u>, the court discussed the holding in <u>Myers v. First National Bank of Scotia</u>, 42 A.D. 2d 657 at 658, stating that:

> the collecting bank is liable to the payor bank
> when the collecting bank presents a check to the
> payor, is paid on the check, and subsequently
> learns that its warranty of title to the payor
> was breached, under section 4-207(1)(a) of the

UCC, because the check was not properly endorsed.

Capital Dit. Te. Emp. Federal Credit Union v. Berthaiaume, 432 N.Y. 2d 435, 440 (N.Y. Supp. 1980). Also, in Continental Bank & Trust Co. v. American Bank & Trust of Pennsylvania, 274 A.2d 549 (1970), it stated:

> [i]n deciding which of the parties must bear this loss, the court below correctly held that Section 4-207 of the Code is controlling. That section provides in pertinent part that "(e)ach ... collecting bank who obtains payment or acceptance of an item and each prior ... collecting bank warrants to the payor bank or other payor who in good faith pays or accepts the item that (a) he has good title to the item or is authorized to obtain payment or acceptance on behalf of one who has a *304 good title." Thus the Code puts the ultimate burden on the first bank honoring the instrument to make certain that the item is properly indorsed.

In Federal Deposit Insurance Corp. v. Marine National Bank of Jacksonville, supra, footnote 4, at 344. Furthermore, under section 4-207(1)(a), a bank which pays a check on a forged indorsement may recover payment from a prior collecting bank or person who received payment thereof, such having warranted to the payor bank or other payor who in good faith pays the item, that he has a good title to it. Commonwealth Federal Sav. & Loan Ass'n v. First Nat. Bank of New Jersey 513 F.Supp. 296 (D.C. Pa. 1979).

In the case of Longview Bank & Trust Co. v. First Nat. Bank of Azle, 750 S.W. 2d 297, 299 (Tex. 1998), a payor bank brought a suit against the depository bank, for the collection of check, which was

31

accepted without the indorsement of one of the joint payees. The court concluded that the loss falls on the depository bank because it violated the presentment warranty of good title in section 4-207. The court stated that "[d]epository banks are best situated to catch alterations or unauthorized or missing endorsements because they deal 'face to face' with the endorser or holder presenting the check." See Fidelity & Casualty Co. v. First City Bank of Dallas, 675 S.W.2d 316 (Tex.App.-Dallas 1984, writ ref'd n.r.e.).

In the present case, the Court concludes that Doral was in the best position to find that the debtor's indorsement was missing in three of the five checks in question and that it could not deposit the checks into the account of Lyon, because the debtor was not named in the account. Doral converted the three checks when it negotiated them lacking the debtor's indorsement and by depositing them in Lyon's account. B&T, now Eurobank, did not convert the checks because, although it paid the checks to Lyon's account in Doral, it was not in the best position to know that debtor's indorsement was missing and because it relied on the presentment warranties of good title of Doral.

4. Damages

Under section 4-207(c) of the UCC,supra,:

> ...the person to whom the warranties under subsection (a) are made and who took the item in good faith may recover from the warrantor as damages for breach of warranty an amount equal to the loss suffered as a result of the breach, but not more than the amount of the item plus expenses

32

and loss of interest incurred as a result of the breach.

In the case of Commonwealth Federal Sav. & Loan Ass'n v. First Nat. Bank of New Jersey 513 F.Supp. 296 (D.C. Pa. 1979), the court stated that when a bank pays a check on a forged endorsement, which has been made applicable also to the situation when there is a missing endorsement, it may recover payment from a prior collecting bank or person who received payment thereof, such having warranted to the payor bank or other payor who in good faith pays the item, that he has a good title to it.

On the other hand, in the case of Saxon Mortg. Services, Inc. v. Harrison, __ A.2d __, 2009 WL 1652157 at page 17 (Md. App. 2009), the court addressed the issue of a conversion and negligence action against a depository bank and a payor bank regarding a check that was issued by an insurance company bearing a forged endorsement. In the case, the court analyzed different factual situations and one of them similar to the present case; where a check was converted by a depositary bank and the debtor was asking in damages the face value of the check converted. The court stated:

> *The supplier should not, without qualification, be able to recover the entire amount of the check from the bank that converted the check.* Depending upon the contract between the contractor and the supplier, the amount of the check may be due [1] entirely to the contractor, in which case there should be no recovery, [2] entirely to the supplier, in which case recovery should be for the entire amount, or [3] part may be due to one and the rest to the other, in which case recovery should be limited to the amount due to the supplier.

33

Saxon Mortg. Services, Inc. v. Harrison, __ A.2d __, 2009 WL 1652157 at page 17 (Md. App. 2009).

However, in the present case, the debtor has not presented evidence as to what amount of the checks, if any, he is entitled to. The Court finds that in order to make a finding regarding the debtor's entitlement to the amount in the checks, the Court must hold a trial where evidence should be submitted by the parties in order to know what agreement, if any, was reached between the debtor, Summertime and Lyon regarding the checks in controversy.

V. Summary

In the present case, the Court concludes that the debtor has an action for conversion against Doral, as the payor bank, because it did not follow the ordinary care standard under section 3-103(7) of the UCC, it deposited the checks into an account held exclusive by Lyon, and because it violated the presentment warranties of good title under section 4-208 of the UCC.

The Court also finds that Eurobank, has failed to identify the portions of the pleadings which it believes demonstrates that there is no genuine issue of material fact to grant summary judgment as to the lack of agreement with the debtor regarding the amount of $390,579.00, that was going to be disbursed at the closing of the sale of the project. Furthermore, although Eurobank did prove that Doral is the one who converted the checks, Eurobank still has to litigate this adversary proceeding in order to prove that it discharged its responsibility by paying the checks, in which only

34

Lyon was able to collect on. In other words, if Doral has to collect from Lyon to pay the debtor, and then Lyon has to collect from Eurobank, then neither of the parties can be released from responsibility until the question as to the debtor's title to the proceeds of the checks has been determined.

<u>ORDER</u>

**IT IS ORDERED** that the Motion for Summary Judgment filed by Eurobank (docket # 161) is hereby **DENIED**. Furthermore, the Partial Summary Judgment (docket # 169) filed by Redondo shall be, and it hereby is **DENIED**. The Clerk to enter a new Pre-Trial order scheduling the matter.

**SO ORDERED.**

In San Juan, Puerto Rico, this 31st day of August, 2009.

/s Gerardo A. Carlo-Altieri

_____
GERARDO A. CARLO-ALTIERI
Chief, U.S. Bankruptcy Judge